Logan Smith (*will comply with LR IA 11-2 within 10 days*)
lsmith@mcnamarallp.com
Edward Chang (NV 11783)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Tel.:    619-269-0400
Fax:    619-269-0401

Michael F. Lynch (NV 8555)
Michael@LynchLawPractice.com
Lynch Law Practice, PLLC
3613 S. Eastern Ave.
Las Vegas, Nevada 89169
Tel.:    702-684-6000
Fax:    702-543-3279

*Attorneys for Court-Appointed Monitor*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Monitor for AMG Capital Management, LLC; BA Services LLC; Black Creek Capital Corporation; Broadmoor Capital Partners, LLC; Park 269, LLC; C5 Capital LLC; DF Services Corp.; DFTW Consolidated [UC] LLC; Impact BP LLC; Level 5 Apparel LLC; Level 5 Capital Partners LLC; Level 5 Eyewear LLC; Level 5 Motorsports, LLC; Level 5 Scientific LLC; NM Service Corp. (f/k/a/ National Money Service); PSB Services LLC; Real Estate Capital LLC (f/k/a/ Rehab Capital I, LLC); Sentient Technologies; ST Capital LLC; Westfund LLC; Eclipse Renewables Holdings LLC; Scott Tucker Declaration of Trust, dated February 20, 2015; West Race Cars, LLC; and Level 5 Management LLC; and their successors, assigns, affiliates, and subsidiaries, | CASE NO. |
| | **MONITOR'S COMPLAINT FOR: (1) FRAUDULENT TRANSFER; (2) QUASI-CONTRACT CLAIM FOR RESTITUTION BASED ON UNJUST ENRICHMENT; AND (3) ACCOUNTING** |
| | **JURY TRIAL DEMAND** |
| Plaintiff, | |
| v. | |
| SELLING SOURCE, LLC; PARTNERWEEKLY L.L.C.; MONEYMUTUAL, LLC; DATAX, LTD.; LONDON BAY CAPITAL LLC; LONDON BAY-TSS HOLDING COMPANY, LLC; LONDON BAY-TSS ACQUISITION COMPANY, LLC; DEREK LAFAVOR; GLENN MCKAY; DOES I-X; and ROE CORPORATIONS I-X, | |
| Defendants. | |

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Monitor"), in his capacity as court-appointed Monitor, hereby brings the following Complaint against Selling Source, LLC ("Selling Source"), PartnerWeekly L.L.C. ("Partner Weekly"), DataX, Ltd. ("DataX"), MoneyMutual, LLC ("MoneyMutual"), London Bay Capital LLC ("London Bay"), London-Bay-TSS Holding Company, LLC, and London Bay-TSS Acquisition Company, LLC, Derek LaFavor ("LaFavor"), and Glenn McKay ("McKay," and collectively, "Defendants") and alleges the following:

**PARTIES**

1.      Plaintiff is the Court-appointed Monitor in the related case *Federal Trade Commission v. AMG Services, Inc., et al.*, 2:12-cv-00536-GMN (VCF) (D. Nev.) ("*FTC v. AMG Services*"), appointed by the Order Appointing Monitor and Freezing Assets entered November 30, 2016 (ECF No. 1099) (the "Monitor Order").  A true and correct copy of the Monitor Order issued in *FTC v. AMG Services* is attached as Exhibit A hereto and incorporated by reference.  The Monitor Order directs the Monitor, *inter alia*, to preserve the value of the assets in the Monitorship Estate and authorizes the Monitor, *inter alia*, to institute actions to preserve or recover those assets. *See id.* at 12.

2.      The Monitor Order defines the Monitorship Estate to include, *inter alia*, all assets of Scott Tucker (the individual defendant in *FTC v. AMG Services*) ("Tucker") and all assets of the  "Monitor Entities" which are identified to include: the corporate defendants named in *FTC v. AMG Services* (AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, and Broadmoor Capital Partners, LLC); the corporate relief defendant named in *FTC v. AMG Services* (Park 269, LLC); and multiple Tucker related and controlled entities: BA Services LLC, C5 Capital LLC, DF Services Corp., DFTW Consolidated [UC] LLC, Impact BP LLC, Level 5 Apparel LLC, Level 5 Capital Partners LLC, Level 5 Eyewear LLC, Level 5 Scientific LLC, NM Service Corp. (f/k/a/ National Money Service), PSB Services LLC, Real Estate Capital LLC (f/k/a/ Rehab Capital I, LLC), Sentient Technologies, ST Capital LLC, Westfund LLC, Eclipse Renewables Holdings LLC, Scott Tucker Declaration of Trust, dated February 20, 2015, West Race Cars, LLC, and Level 5 Management LLC, and their successors, assigns, affiliates, and subsidiaries.

3.       Defendant Selling Source, LLC is a Delaware limited liability company.  Selling Source is a holding company that owns other entities and provides Internet marketing services to entities in the payday lending industry.  Together with Partner Weekly, DataX, and other related subsidiaries the "Selling Source Defendants".   Selling Source's related subsidiaries included Optimized Contact Solutions, Ltd. and TeleWeb Marketing, L.L.C., which were merged out of existence in 2007.

4.       Defendant PartnerWeekly L.L.C. is a Nevada limited liability company engaged in the business of marketing and generating Internet leads for sales to payday lenders, who are Partner Weekly's customers.  Partner Weekly is Selling Source's primary operating subsidiary and acts as Selling Source's agent in running www.MoneyMutual.com.

5.       Defendant DataX, Ltd. is a Nevada limited liability company and a credit reporting agency.  During the relevant time period, DataX provided consumer credits reports to third parties, including the payday lending industry.

6.       Defendant MoneyMutual, LLC is a Nevada limited liability company and acts primarily as a holding company for the MoneyMutual brand, including www.MoneyMutual.com. During the relevant time period, MoneyMutual advertised payday loans and other short-term lending products online to consumers through its websites.  Defendant Partner Weekly launched the MoneyMutual brand in 2009.

7.       Defendant London Bay Capital LLC is a Delaware limited liability company and a private equity company.  London Bay acquired Selling Source from Monitor Entity Black Creek Capital Corporation ("Black Creek Capital") in December 2007.  London Bay is the controlling member of London-Bay-TSS Holding Company, LLC.

8.       Defendant London-Bay-TSS Holding Company, LLC is a Delaware limited liability company and the controlling member of London Bay-TSS Acquisition Company, LLC.

9.       Defendant London Bay-TSS Acquisition Company, LLC is a Delaware limited liability company and the controlling member of Selling Source. Defendants London Bay, London Bay-TSS Acquisition Company, LLC, and Defendant London-Bay-TSS Holding Company, LLC are collectively referred to as the "London Bay Defendants."

2

10.     Defendant Derek LaFavor is the former co-owner with Tucker of the Selling Source Defendants and was the CEO of Selling Source for 12 years.  He worked at Selling Source from 1997 to 2010.  Subsequent to the sale of the Selling Source Defendants to the London Bay Defendants, he continued to work there as CEO and, on information and belief, maintained minor equity stakes in the Selling Source Defendants after the sale.  He is a resident of Las Vegas, Nevada.

11.     Defendant Glenn McKay is currently the President and CEO of Selling Source.  He joined Selling Source in 2000 and worked there both before and after the sale of the Selling Source Defendants to the London Bay Defendants.  He is a resident of Las Vegas, Nevada.

12.     The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants herein designated as DOE I through DOE X and ROE CORPORATION I through ROE CORPORATION X are unknown to Plaintiff, who therefore sue said Defendants by such fictitious names.  Plaintiff believes and thereon alleges that other defendants named as DOE and ROE CORPORATION defendants are responsible in some manner for the acts complained of herein and described more fully *infra*.  Plaintiff will seek to amend this Complaint to allege their true names and capacities as they are ascertained in this action.

13.     The Monitor is informed and believes, and on that basis alleges, that Defendants acted at all times mentioned herein as the actual and/or ostensible agents or representatives of each other and, in doing the activities alleged herein, acted within the scope of their authority as agents and representatives, and with the permission and consent of each other.  In undertaking the acts alleged herein, each Defendant was acting in concert with the other Defendants, and as each other's alter egos.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter under 28 U.S.C. § 754, § 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction.  *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("the receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

15. Venue in the District of Nevada is proper pursuant to 28 U.S.C. § 1391, because the Court retained jurisdiction of this matter for all purposes and appointed the Monitor in the District of Nevada on November 30, 2016, and because this proceeding is supplemental to *FTC v. AMG Services*. *See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well.")

16. The Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Monitorship Estate under the Court's Orders issued in *FTC v. AMG Services*.

## OVERVIEW

17. This is an action, *inter alia*, to clawback as fraudulent transfers millions of dollars in Monitorship Estate assets transferred to Defendants that were proceeds of the illegal payday loan businesses centrally operated by Tucker out of Overland Park, Kansas.

18. Beginning in 1997 and for more than a decade, Tucker operated a large scale, highly profitable and illegal payday loan business based in Kansas. This business combined unlawful practices (exorbitant interest rates and deceptive loan disclosures) with a phony structure (a sham relationship with a bank to skirt state usury laws and sham relationships with Indian tribes to skirt regulation all together by invoking the tribes' sovereign immunity).

19. After entering a Judgment of liability and a monetary award of more than $1 billion against Tucker and his controlled entities, the Court in *FTC v. AMG Services* entered the Monitor Order as a post-judgment vehicle to freeze and preserve assets while Tucker appealed that judgment.

20. As authorized by the Monitor Order, the Monitor brings this action to recover the Monitorship Estate assets disbursed to Defendants. Over an extended period, Defendants enriched themselves through their close relationship with Tucker and the Monitor Entities and tribal entities over which Tucker exercised complete control and domination.

21. Defendants were central to the success and exponential growth of Tucker's illegal business. The Selling Source Defendants were co-owned by Tucker prior to the sale of his 50%

equity stake in December 2007 to the London Bay Defendants.  The Selling Source Defendants served as the "lead generators," whose job it was to attract and find potential borrowers, collect personal information from the borrowers, and then refer them – for a hefty fee – to lenders, which then provided the illegal payday loans.

22.    Defendants' biggest customer was Tucker and his intricate web of payday lending entities based in Overland Park, Kansas.  This was the case both before and after Tucker sold his ownership interest in the Selling Source Defendants.  Tucker entities paid Defendants a fee for every customer lead.  In fact, as part of the transaction when the London Bay Defendants purchased the Selling Source Defendants from Tucker and others, Tucker agreed that his payday lending businesses would continue to exclusively buy leads from the Selling Source Defendants.

23.    By virtue of their close affiliation with Tucker and his business entities, Defendants possessed intimate knowledge of Tucker's aggressive business practices and well understood Tucker's complete control of and domination over the enterprise, including the Monitor Entities and the tribal entities.  Defendants were well aware of mounting red flags reflecting Tucker was operating an illegal business.  They not only knew about state regulatory investigations, consumer complaints, and the FTC's action, but also had immediate access to and an understanding of the inner workings of Tucker's operations in Overland Park, Kansas.  Accordingly, Defendants had every opportunity to investigate and verify the many concerns and allegations continually raised against Tucker and his Overland Park web of payday lending businesses.  Thus, Defendants knew or should have known that monies received from Tucker's operations were not rightfully theirs.  Rather, those monies belonged to the Monitorship Estate and were the proceeds of an ongoing common fraudulent enterprise operated and directed by Tucker.

24.    The millions of dollars in transfers resulted in exorbitant sums being paid to Defendants long after both the harsh light that the media shined on Tucker's businesses in fall 2011 and the FTC's lawsuit brought in April 2012.

### *FTC v. AMG Services*

25.    The Complaint in *FTC v. AMG Services*, filed April 2, 2012, alleged that Tucker and his related entities operated a massive common enterprise from Overland Park, Kansas

engaged in illegal and deceptive practices by, *inter alia*, offering consumers payday loans via disclosures that misled them about the true cost of the loan, requiring that consumers pre-authorize electronic fund transfers, and engaging in unlawful debt collection practices.

26.     The Complaint alleged violations of Section 5(a) of the FTC Act which prohibits deceptive acts or practices in commerce, the Truth in Lending Act which requires full and accurate disclosure of the true costs of the loan, and the Electronic Funds Transfer Act which prohibits conditioning the extension of credit on a consumers' preauthorization of electronic funds transfers.

27.     In addition to Tucker, the named defendants in *FTC v. AMG Services* included Tucker's loan servicing companies (AMG Services, Inc. (which had "merged" with CLK Management LLC), NM Service Corp., and Universal Management Services, Inc.), the three Indian tribal entities through which Tucker operated and controlled (Red Cedar Services, Inc., SFS, Inc. and MNE Services, Inc.), and the four Tucker corporate lending companies (AMG Capital Management, LLC, Level 5 Motorsports LLC, Black Creek Capital, and Broadmoor Capital Partners, LLC).  The Complaint also alleged that Tucker centrally operated and controlled these businesses from Kansas as a common enterprise and he directed and controlled the entities, and had signatory authority on every corporate bank account.

28.     As described herein, Partner Weekly was initially named as a defendant in *FTC v. AMG Services*, but later dismissed without prejudice.

29.     The Court bifurcated the proceedings into two phases.  During Phase I, the Court adjudicated the merits of the FTC's claims for violations of the FTC Act, TILA, and EFTA.  During Phase II, the Court adjudicated remaining issues, including individual liability, affirmative defenses, and remedies.

30.     As to Phase I, on May 28, 2014, the Court granted summary judgment in favor of the FTC and against Tucker and other defendants on Count I (Deceptive Acts and Practices in violation of the FTC Act) and Count III (Violations of TILA and Regulation Z).  *See FTC v. AMG Services*, ECF No. 584.

31.     In 2015, the Court entered permanent injunctions and monetary judgments against the three tribal lending entities that were fronts for Tucker's operations – Order of January 23,

2015, against MNE Services, Inc. for $21 million (ECF No. 727); Orders of November 25, 2015 against Red Cedar and SFS for $2.2 million each (ECF Nos. 888-89).

32.     As to Phase II, on September 30, 2016, the FTC's motion for summary judgment against Tucker, Level 5 Motorsports, LLC, Black Creek Capital Corporation, and AMG Capital Management, LLC, among others, was granted.  A true and correct copy of the Order Granting Summary Judgment issued in *FTC v. AMG Services* is attached as Exhibit B hereto and incorporated by reference.  The Court entered a judgment in the amount of $1,301,897,652 as equitable monetary relief.  *See id.* at 29.

33.     The Court found that Tucker structured the tribal lending entities based in Overland Park to be completely dependent on the Tucker loan servicing companies also based in Overland Park, and that Tucker and his related entities operated as a common enterprise and were thus jointly and severally liable.  *Id.* at 12, 18.

**The Monitor**

34.     On November 30, 2016, the Court entered the Monitor Order to facilitate post-judgment collection and enforcement of the previously entered asset freezes.  *See FTC v. AMG Services*, ECF No. 960 and 1030.  The Monitor Order includes a similar asset freeze provision. *Compare FTC v. AMG Services*, ECF No. 960 at 14 with *FTC v. AMG Services*, ECF No. 1099 at 6.

35.     The Monitor Order granted the Monitor wide powers to preserve the value of the Monitorship Estate assets under the Asset Freeze Order, including but not limited to obtaining or creating an accounting of the assets and preventing the transfer, withdrawal or misapplication of the assets.  *See* Exhibit A at 12.

36.     The Monitor Order further authorized the Monitor to conduct such investigation and discovery as may be necessary to locate and account for additional assets and to "[i]nstitute, compromise, adjust, appear in, intervene in, or become a party to such actions or proceedings in state, federal or foreign courts that the Monitor deems necessary and advisable to preserve or recover the Monitorship Estate or to carry out the Monitor's mandate under this order."  *See* Exhibit A at 13-15.

37.     Until the appointment of the Monitor, Tucker had exercised full, complete, and exclusive control of, and domination over, the Monitor Entities.  Certain assets of the Monitor Entities were nominally held by tribal entities also under Tucker's control through a sham relationship.

38.     Prior to the Monitor's appointment, Tucker took no actions to prevent or vindicate the harms caused to the Monitorship Estate by the fraudulent transfers to Defendants among others. While Tucker remained in control of the Monitor Entities, the fraudulent transfers to Defendants were concealed and only became discoverable and legally actionable after the Monitor had been appointed and empowered to bring suit to recover such assets.

39.     During the course of his investigation, the Monitor identified transfers of Monitorship Estate assets to Defendants, which rightfully belong to the Monitorship Estate. The Monitor brings this action to void these fraudulent transfers and to claw back from these Defendants.

**Tucker's Criminal Conviction**

40.     In February of 2016, Tucker, along with his attorney, Timothy Muir ("Muir"), was indicted on fourteen felony counts in the Southern District of New York in connection with the payday lending enterprise operating out of Overland Park, Kansas.

41.     The Superseding Indictment, filed on November 30, 2016, included allegations that the loan disclosures were materially false and misleading in setting forth the overall cost of the loan to the consumer; the loans were made at usurious rates; and Tucker sought to shield these illegal operations through sham transactions that made it appear that the lenders were Native American tribal entities immune from state usury laws.

42.     On October 13, 2017, Tucker and Muir were convicted on all fourteen counts charged in the Superseding Indictment.

**Tucker's Fraudulent Payday Lending Activities**

43.     From 1997 through at least 2013, Tucker founded, controlled, and dominated a web of illegal payday lending companies based in Kansas.  For the vast majority of the time, Tucker's
///

enterprise was located at the same address, 10895 Lowell Avenue, Overland Park, Kansas.  These companies marketed and serviced short-term payday loans.

44.     Tucker's companies included the three loan servicing companies, NMS, CLK Management LLC ("CLK"), and Universal Management Services, Inc. ("UMS") (collectively the "Loan Servicing Companies." *See* Exhibit B at 3.  UMS is a subsidiary of NMS.

45.     CLK was formed by Tucker as a Kansas entity to provide an operational umbrella for all of his portfolios.  As described by Tucker's counsel in a 2009 mediation brief, "Since Tucker was in Kansas operating and managing the NMS' portfolio inside the County Bank Program, as well as the Nominee Portfolio Companies and their portfolios which were outside of the County Bank Program, Tucker decided to form a single Kansas entity that would provide the operational umbrella for all of the portolios."  This entity was CLK, which operated under Tucker's direction and control from the same Overland Park address.  CLK performed a variety of tasks, including acquiring equipment for the benefit of the other portfolios, hiring employees, renting space, contracting with outside vendors, and paying for everything necessary to operate the portfolios.

46.     CLK later "merged" with AMG Services, Inc. ("AMG Services"), another tribal entity, in an effort to bring its operations within the tribe's sovereign immunity.  This "merger" was accomplished by a scheme orchestrated by Tucker, with the assistance of counsel who filed a sham lawsuit in Kansas court to confirm the "merger".  *See U.S. v. Scott Tucker*, 254 F. Supp. 620, 622-23 (S.D.N.Y. 2017) (applying crime-fraud exception to documents relating to Kansas lawsuit, because of government's evidence showing probable cause that lawsuit was a "'sham' lawsuit orchestrated for the purpose of invoking tribal immunity as to defendants' allegedly usurious lending practices").

47.     Tucker managed, owned, operated, controlled, and dominated the tribal lenders, the service companies, and the corporate lenders and the other Monitor Entities from his base of operations in Overland Park, Kansas, where at one point in excess of 600 employees worked.

*The Rent-a-Bank Model*

48.     In order to skirt usury laws in effect in most states, beginning in or about 1997, Tucker and his business partners, including Charles Hallinan, invoked an illegal "rent-a-bank

model" by which they "exported" interest rates from County Bank of Rehoboth, Delaware ("County Bank"), which was incorporated in a state with no usury laws.  This provided the appearance of legitimacy with County Bank as the front for the payday lender, while the actual lender controlled by Tucker would claim only to "service" the loan.

49.    Tucker knew that this set-up was a sham in violation of the law and knew that the bank did not control the loan approval process or fund the loans, but was paid to act as a front for the illegal enterprise.

50.    In 2003, the States of Kansas, Colorado, and California sued Tucker and certain of his payday lending operations for violation of anti-usury laws.

*The Rent-a-Tribe Model*

51.    Beginning in 2003, Tucker embraced a new model in which he funneled activities through corporate entities nominally owned by various Native American tribes to invoke the sovereign immunity of the tribes and avoid legal restrictions.  This model was based on the sham that the tribes owned and controlled the entities when, in fact, Tucker did so.

52.    To implement this model, between 2003 and 2008, Tucker's loan servicing companies entered into agreements with several tribes to become "authorized lenders" for his companies.  *See* Exhibit B at 3; *see also FTC v. AMG Services*, ECF Nos. No. 908-02, 908-014, 908-015 (Agreements).  The tribes, in turn, formed new corporate entities to facilitate these payday loans, including MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc.  *See* Exhibit B at 3.

53.    As part of these efforts, Tucker's companies assigned to the tribal entities multiple trademarks related to websites used by Tucker to offer payday loans. *See* Exhibit B at 14-16; *see also FTC v. AMG Services*, ECF No. 908-6 (Trademark assignment records).

54.    While Tucker wanted to create the appearance that the tribal entities had a substantive role in the operations, in reality, as Tucker knew, the tribes were no more than conduits for Tucker's unlawful payday lending businesses.

55.    In February 2016, tribal entities AMG Services and MNE Services, Inc., which were corporations nominally established by the Miami Tribe of Oklahoma, entered into a Non-Prosecution Agreement with the U.S. Attorney's Office for the Southern District of New York, in

which they admitted and affirmed that Tucker had complete control of the tribal entities. Specifically, the tribal entities admitted the following facts as true:

> 1.     In late 2003, representatives of The Miami Tribe of Oklahoma ("The Miami") learned that Scott Tucker owned and operated a business that made "payday loans." In or around November 2003, The Miami received a letter of intent from National Money Service, a company controlled by Tucker, contemplating a "Pay Day Loan Business Agreement" between The Miami and Universal Management Services, Inc. ("UMS"), a company also controlled by Tucker. Under the letter, a tribal entity would "become an authorized lender" and "earn substantial income," while "relying upon" National Money Service "to provide not only the capital to fund all loan transactions and all working capital requirements, but also the personnel, equipment, marketing and knowledge to make the business an immediate success." The letter was followed by a written agreement between the Miami Tribe of Oklahoma Business Enterprises ("MTBE") and UMS. The agreement provided that MTBE would conduct business in the name "Tribal Financial Services" ("TFS"), and that MTBE would receive a monthly fee and cooperate with UMS "to do all things reasonable [sic] necessary to carry on the payday loan business as may be required by UMS." It was understood that this duty to cooperate included a duty of MTBE and TFS to invoke tribal sovereign immunity in response to any efforts by state governments to regulate or impose sanctions or prohibitions on such "payday loan business."

> 2.     Under the agreement, Tucker and entities controlled by Tucker, and not The Miami, provided the capital to make loans, and The Miami and its entities were not responsible for any losses. Neither The Miami, nor any entity that it controlled, established or paid to acquire any part of Tucker's payday lending business. Tucker and others based in Overland Park, Kansas, and not The Miami, managed operations and created the loan approval criteria. All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker.

> 3.     Tucker, and others reporting to Tucker, using powers of attorney, opened or caused to be opened certain bank accounts in the names of entities controlled by The Miami. Neither The Miami nor any entity that it controlled exercised control over these accounts.

> 4.     In certain state court litigations, a then representative of The Miami who was then also an officer of entities controlled by The Miami that were involved in the loan business submitted factual declarations. These declarations were false, in part, because they overstated the involvement of such former representative and that of The Miami and/or entities controlled by the Miami in the operations of the loan business.

*See* https://www.justice.gov/usao-sdny/file/823666/download.

///

11

56.     While each of the tribes nominally held bank accounts in the names of tribal-related entities, these accounts were in reality controlled by Tucker who used them to fund millions of dollars in personal expenses, including international trips, a private jet, and a professional auto racing team.  Tucker also used the funds nominally in the tribes' portfolio accounts to enrich Defendants.

57.     Through counsel, Tucker successfully secured the dismissal of multiple lawsuits by claiming that the tribes had substantive ownership and control of the lending entities and were thus protected by "tribal sovereign immunity," thereby enabling the illegal payday lending operations to continue for many years.

**Defendants' Activities with Tucker's Payday Lending Activities**

58.     Selling Source and its subsidiaries, most notably Partner Weekly, were collectively embedded in the payday lending industry as a prominent lead generator, which attracted and found potential borrowers and then referred them – for a hefty fee – to lending entities which actually provided the customers with usurious loans. Selling Source euphemistically referred to these payday lenders as "specialty lenders."  For many years, Defendants provided customer leads and related information to the web of payday lending companies centrally operated and controlled by Tucker in Kansas.  Defendants received hundreds of millions of dollars from Tucker's illegal payday lending business.

59.     From at least 2003 onwards, Selling Source was vital to the operation of Tucker's payday lending enterprise, providing Tucker entities with thousands upon thousands of consumer leads located throughout the nation.  As the "lead generators," Defendants had the essential role of attracting and finding potential borrowers, collecting information from borrowers, and then referring them to the lenders.  An overwhelming percentage of the borrowers to Tucker's websites arrived from "lead generators."  This was principally done through Partner Weekly, but Defendants offered a variety of services to payday lenders.  For instance, DataX provided consumer credit reporting and data verification services specifically for the payday lending industry.

60.     Previously, Selling Source was co-owned (50%) by Tucker through Monitor Entity, Black Creek Capital.

61.     Tucker sold his ownership interest in Selling Source in December 2007, when the London Bay Defendants paid approximately $90 million to acquire Selling Source.  A true and correct copy of the Agreement and Plan of Merger and Purchase Agreement is attached as Exhibit C hereto and incorporated by reference.

62.     During Tucker's co-ownership of the Selling Source Defendants and at the time of the sale, the Selling Source Defendants' success and profitability were largely dependent upon Tucker's Overland Park operations.   In fact, Alton Irby, Defendant London Bay's managing member, testified in Tucker's criminal trial that approximately 50% of Selling Source's revenue was derived from Tucker's payday lending business at the time of the sale.  A true and correct copy of the transcript of Alton Irby's testimony on September 20, 2017 in *U.S. v. Tucker*, Case No. 16 Cr. 91 (PKC) is attached as Exhibit D hereto and incorporated by reference.  *See* Exhibit D at 964.

63.     Pursuant to the purchase and sale agreement, Tucker sold his equity interests in Defendants Selling Source, Partner Weekly, and DataX to the London Bay Defendants.  Prior to the sale, Tucker via his ownership of Black Creek Capital, had owned 50% of the following entities (which were thereafter merged into Selling Source):

a.     Absolute ROI, LLC;

b.     CashLoanNetwork.com, LLC;

c.     ePointMarketing, LTD f/k/a DL001;

d.     eTelMarketing, LLC;

e.     Extreme Traffic Team, LLC;

f.     Marquisnet, LLC;

g.     Mobile Sciences Knowledge Group, LLC;

h.     Optimized Contact Solutions, Ltd.; and

i.     Trendex Media, LLC.

64.     As part of the transaction, Tucker, on information and belief, like Defendant LaFavor and Defendant McKay, kept small ownership interests in the Selling Source Defendants.  Tucker's ownership interests were Mandatorily Redeemable Preference Shares ("MRPs").

65.     After the London Bay transaction, Defendants remained inextricably linked with and mutually dependent upon Tucker's Overland Park businesses.  In fact, there was a specific provision in the purchase and sale agreement ensuring that Tucker continued to exclusively purchase leads from Selling Source after the sale to the London Bay Defendants.  *See* Exhibit C at § 4.12(e); *see also* Exhibit D at 964-966.

66.     Specifically, Selling Source had an exclusive contract with Tucker, under which the Tucker payday businesses were required for 10 years from the date of the Agreement (until December 2017) "to purchase all of its online leads from [Selling Source] and its Affiliates, consistent with past practice . . . ."  Exhibit C at § 4.12(e).

67.     Defendants fully understood that Tucker, and not anyone affiliated with a tribe, controlled, owned, and directed AMG Services, even though it was nominally a tribal entity.  This point is made clear by Alton Irby's prior testimony.  Mr. Irby swore under oath in summer 2009 that he met with Tucker, whom he called "the owner and principal of AMG, Selling Source's largest customer."  A true and correct copy of Alton Irby's Declaration dated August 11, 2009 and filed in *Selling Source, LLC v. Red River Ventures, LLC, et al.*, Case No. 2:09-cv-01491-JCM-GWF (D. Nev. Aug. 11, 2009) is attached as Exhibit E hereto and incorporated by reference.  *See* Exhibit E at ¶ 8.

68.     On information and belief, Defendants rarely, if ever, dealt with anyone associated with a tribe.  To the contrary, "London Bay work[ed] consistently with the owner of AMG to help manage its relationship with Selling Source." *Id.* at ¶ 4.  Defendants also understood that the entire operations were not located on tribal land, but rather in Overland Park, Kansas.

69.     In fact, just as before, and consistent with the exclusive contract, Tucker remained Selling Source's largest customer after the transfer of ownership to the London Bay Defendants.

70.     Defendants continued to be paid millions upon millions of dollars for generating leads of potential borrowers who stood ready to accept one of Tucker's illegal loans from the entities over which Tucker exercised complete control and domination.  For example, in London Bay's first year of ownership alone (2008), Selling Source was paid $80 million by Tucker's AMG entity.  *Id.* ¶ 4.

14

71.     In the 2009 sworn statement and in 2017 testimony in Tucker's criminal trial, Mr. Irby confirmed just how important Tucker was as a partner to Selling Source.  In his declaration submitted in litigation against Red River Ventures, LLC, whom Selling Source claimed were stealing leads that belonged exclusively to Tucker (the "Red River Litigation"), Mr. Irby stated that "Selling Source is dependent on AMG for the majority of its business."  *Id.* ¶ 19.

72.     In his declaration, Mr. Irby stated as follows:

> Selling Source's largest customer is AMG, to whom it provides many services, primarily the sale of consumer leads; the leads sold to AMG are exclusive and proprietary to AMG as well as to Selling Source.  London Bay works consistently with the owner of AMG to help manage its relationship with Selling Source.

*Id.* ¶ 4.

73.     By the time of the Red River Litigation, principals at London Bay, namely Mr. Irby and Sam Humphreys, the CEO of London Bay, had already developed a close personal relationship with Tucker dating back to at least 2006.  For example, Mr. Irby and Mr. Humphreys routinely referred to Tucker as "partner."  In an April 2007 e-mail, Mr. Irby wrote to Tucker that he was "proud to have a partner as skilled as you."

74.     When London Bay purchased Selling Source in December 2007, Mr. Irby wrote Tucker that: "We are proud to be your partners.  Now we will make some money together instead of dealing with banks . . . ."

75.     Mr. Irby, Mr. Humphreys, and others associated with the London Bay Defendants also made trips to meet Tucker, including going to Tucker's base of operations in Kansas.

76.     Tucker also invited Mr. Humphreys and Mr. Irby, whom he referred to as his "Good Luck Charms," to his auto races and exchanged e-mails about Tucker's racing prowess.  For instance, after attending a race in May 2008, Tucker sent an article to Mr. Irby and Mr. Humphreys stating that "Tucker sweeps infineon wins both Saturday and Sunday."  Mr. Irby enthusiastically responded, "Unbelievable! You are the MAN!"  Mr. Irby followed up with a second e-mail that day stating, "I don't know that I have ever seen such a combination of skill, concentration and courage."

///

77.     In particular, on information and belief, Tucker had a close and candid relationship with Mr. Humphreys.  In one e-mail conversation in April 2009 with Mr. Humphreys, Tucker referred to Mr. Humphreys as the "master Deal Maker" and asked him about "interested suitors and [private equity] firms" and whether there was "any financial engineering magic available?," to which Mr. Humphreys replied "Possibly" and that he was "working on it."

78.     Tucker also openly discussed concerns to Mr. Humphreys about the conduct of his colleague, Mr. Irby (whom the two of them referred to as the "Sand Man" or "SandMan"); in one exchange in the summer of 2009, Mr. Humphreys reassured Tucker that he "got [Mr. Irby] back in his cage."

79.     During the summer of 2009, Mr. Humphreys also kept Tucker apprised of discussions with the defendants in the Red River Litigation, whom Selling Source and Tucker claimed were "stealing leads (data) from the Selling Source server storage that houses the Selling Source/AMG proprietary information."  Exhibit E at ¶ 17.  For instance, in a July 2009 e-mail, Mr. Humphreys wrote Tucker that, "They said they are marking up an agreement to present before they allow access to the servers.  We said: "NO CONCESSIONS, NO NEGOTIATION.  Come let us in, or we turn this over the authorities.  They said they will respond shortly."

80.     Starting in 2009, a primary vehicle that Selling Source utilized to generate leads was its website, www.moneymutual.com.  In MoneyMutual's advertisements, which relied upon celebrity spokesman Montel Williams, the company claimed to want "to help [people] live better physically, spiritually, financially, and emotionally," by providing a resource for short-term loans "quickly and easily."  On information and belief, many of the consumers driven to Tucker's payday lending businesses used that website.  Selling Source advertised MoneyMutual to consumers nationwide in September 2009 through television, radio, print, online advertisements, and direct-to-consumer mailings.

81.     On information and belief, many customer leads were for people located in states that prohibited the very types of loans that Tucker was selling, *i.e.*, small-dollar loans made by nonbank lenders which exceeded certain interest rate caps.  The typical representative APR on

///

Selling Source's MoneyMutual website ranged between 261% and 1304% for a 14-day loan, well in excess of the legal limit in numerous states where Selling Source offered its services.

82.    Thus, Defendants understood that the absurd interest rates offered by the Tucker-related entities were causing direct harm to consumers across the nation.

83.    Defendants understood that the interest rates offered by the Tucker-related entities also violated the usury laws of numerous states where consumer leads provided by Selling Source and related Defendants were provided to Tucker-related entities.

84.    For instance, New York General Obligation Law § 5-501 and New York Banking Law § 14-a prohibit consumer loans under $250,000 made by nonbank lenders with an interest rate exceeding 16%.  Additionally, New York Banking Law § 340 prohibited unlicensed, nonbank lenders from soliciting and marketing consumer loans of less than $25,000 with interest rates exceeding 16% per annum.

85.    On information and belief, Selling Source continued to sell, profit from, and provide many customer leads to the Tucker's entities, even though it knew that the states where those customers were located had anti-usury/consumer protection laws, which the loans Tucker offered were violating.  Based on the wealth of information available to them, Defendants knew or should have known that the Tucker entities were selling illegal loans to customers, which Defendants had provided.

**Defendants' Knowledge of Multiple Red Flags**

86.    As detailed herein, Defendants had a multitude of opportunities to turn the spigot off, but did not do so, despite the existence of numerous – and mounting – red flags over many years.  Instead, Defendants kept selling, profiting from, and providing these consumer leads to Tucker's payday lending enterprise, even long after the FTC brought charges against Tucker in April 2012.

///

///

///

///

*Knowledge of Tucker's Fraudulent Payday Lending Business During Tucker's Ownership of Selling Source*

87.     Prior to the sale of Selling Source to the London Bay Defendants, transfers made to Defendants were known, or should have been known, to be the proceeds of Tucker's fraudulent enterprise, given Tucker's central role, involvement in, and major ownership in Selling Source and related entities.

88.     On information and belief, Defendant LaFavor and Defendant McKay received portions of these proceeds, and each knew or should have known that these proceeds, or at least a substantial portion thereof, were not theirs to keep.

*Knowledge of Tucker's Fraudulent Payday Lending Business at the Time of the Sale to the London Bay Defendants in December 2007*

89.     Dating back to the time that Tucker sold Selling Source to the London Bay Defendants, there were already numerous red flags that should have given Defendants at that time great pause.

90.     The Selling Source Defendants were already infected by their intimate familiarity with Tucker's Overland Park operations by his years of ownership and symbiotic business relationship that primed the pump of his fraudulent payday lending business.

91.     The London Bay Defendants also had multiple warning signs as well as early as 2007.

92.     The due diligence that the London Bay Defendants performed prior to purchasing Selling Source and its subsidiaries was extensive, lasting apparently nine months.  *See* Exhibit D at 981-982.

93.     Given the overwhelming dependence of Selling Source on Tucker's business, on information and belief, any reasonable due diligence would have necessarily included an understanding of Tucker's business model, related regulatory and legal risks, and Tucker's personal background.

///

///

94.     At the time of the purchase in 2007, the London Bay Defendants already had great familiarity with the payday lending industry generally, but through their due diligence, they learned or should have learned about the specific practices of Tucker's Overland Park businesses, including the exorbitant interest rates they charged consumers and their history operating at the margins of the law.  Defendants also learned or should have learned that the Tucker payday lending business, in which Selling Source was actively participating to generate 50% of its revenues, was causing direct harm to thousands of consumers across the nation.

95.     At the time of the purchase at the end of 2007, Defendants also knew or should have known that Tucker and his payday lending businesses had been hounded by consumer complaints and state regulators for many years for running illegal payday lending operations that preyed upon vulnerable consumers by charging usurious interest rates.  The regulatory landscape on a state-by-state basis – and the legal limits for short-term low dollar payday loans – were essential to their business model of providing customer leads.  For instance, in 2003, the States of Kansas, Colorado, and California sued Tucker and some of his payday lending operations for violation of anti-usury laws.

96.     Such due diligence would likely have revealed that Tucker had previously been convicted of two federal felony charges of mail fraud and making a false statement to a bank as well as a felony charge in the State of Missouri for passing a bad check and as a result had served a year in Leavenworth federal penitentiary.

*Subsequent Red Flags During the London Bay Defendants' Ownership and Control of Selling Source*

97.     From the time of the purchase, Defendants' knowledge of the Tucker payday lending enterprise only grew.  There was a deluge of additional troubling revelations from 2009 on, all of which Defendants apparently ignored.  Instead of investigating these red flags, Defendants' business with Tucker – and payments from Tucker – grew exponentially.

*First*, Defendants knew or should have known about the increasing media scrutiny that Tucker was receiving, particularly by fall 2011.  As a prominent example, in September 2011, CBS News teamed with the Center for Public Integrity to release the results of a months-long investigation

regarding      Tucker's      payday      lending      business.   *See,      e.g.,*
https://www.publicintegrity.org/2011/09/26/6605/payday-lending-bankrolls-auto-racers-fortune;
https://www.publicintegrity.org/2011/09/28/6656/race-car-driver-scott-tucker-drew-elaborate-facade-around-his-payday-loan-businesses;      https://www.cbsnews.com/news/how-payday-lenders-pull-off-crippling-rates/; and  https://www.cbsnews.com/news/federal-trade-commission-investigating-online-payday-lender-profiled-by-cbs-news/.

98.     On September 26, 2011, CBS News ran a story on this investigation in which Armen Keteyian interviewed a victim of one of Tucker's portfolio companies, who had received a payday loan with a 476% APR.  The victim said that the lenders "can do whatever they want to poor people like me."  *See* https://www.youtube.com/watch?v=yxqPJAFwFvs.

99.     When Mr. Keteyian attempted to visit Tucker's Overland Park operations where three payday lenders supposedly owned by tribal entity AMG Services were located, he was turned away and told by an employee that she was not at liberty to identify the owner.  Mr. Keteyian then noted that court papers in ongoing litigation in West Virginia and Colorado had identified Tucker as a "key player" behind AMG Services, who was a convicted felon.  *See id.*

100.     This investigative reporting, by CBS and the Center for Public Integrity, including two September 2011 articles, among other things, exposed the "strange commingling of the interests of Tucker and the Indian Tribe."  "Tucker is living the life of luxury and spending a fortune on his racing hobby, while the tribes may only be getting a small piece of the revenue from the business. . . .  [The investigation] found evidence in court and public records that Tucker still pulls the strings on the businesses he founded. . . . Most revealing of all, bank records show Tucker and his brother Blaine were the only two people able to sign for four payday lending businesses of one tribe."

101.     *Second,* Defendants became aware only months later of the FTC's complaint filed against Tucker and multiple related entities on April 2, 2012.  *See FTC v. AMG Services*, ECF No. 1 (Complaint).  The FTC's complaint alleged, *inter alia,* that Tucker was at the center of a massive common enterprise preying upon consumers through deceptive acts and practices and other violations of the law by offering illegal payday loans requiring consumers to pay

significantly more than what had been represented to them.  The FTC also alleged that Tucker operated and controlled these business from Kansas with signatory authority on every corporate bank account of both Monitor Entities *and* tribal entities.

102.    Defendants knew about the FTC's allegations, because one of the parties initially sued by the FTC in April 2012 was Defendant Partner Weekly.

103.    Defendants actually participated in the FTC's lawsuit and were well aware of the allegations.  For example, on April 13, 2012, Partner Weekly filed an unopposed motion for extension of time to respond to the FTC's motion for preliminary injunction and other equitable relief.  *FTC v. AMG Services*, ECF No. 16.  On April 17, 2012, the FTC filed its executed summons on Partner Weekly.  *FTC v. AMG Services*, ECF No. 23.  In May 2012, the FTC and Partner Weekly agreed to stay the case as to Partner Weekly, and in July of 2012, the FTC stipulated to the dismissal without prejudice of Partner Weekly.

104.    In 2012, the FTC also served broad subpoenas upon Defendants seeking to uncover a variety of records relating to Tucker and Tucker-related entities, given their central role in the Tucker payday lending enterprise.

105.    In summer 2012, certain defendants in the FTC case moved to quash the subpoenas as to Selling Source and Partner Weekly (which the Court denied).  In defending their issuance of subpoenas to the Selling Source Defendants, the FTC noted the centrality of Partner Weekly and Selling Source to the Tucker enterprise stating as follows:

> As noted above, the FTC alleges that Defendants' borrowers are deceived by the terms of their online loans.
>
> The Lending Defendants have themselves stated that an overwhelming percentage of their borrowers arrive to their websites from "lead generators." (5/4/12 Lending Defendants' Memorandum in Opposition to Motion for Protective Order at 11.)  In the case of payday loans, lead generators attract and find potential borrowers, collect information from them, and then refer the potential borrowers to lenders who actually provide the loans. (*Id.*; *see also* note 4, *infra*.)
>
> Partner Weekly, LLC ("Partner Weekly") is a prominent lead generator for the online payday lending industry, and a major supplier of borrowers for the Lending Defendants. Indeed, Partner Weekly was formerly 50% owned by Black Creek Capital (a Defendant here) (Docket No. 5-28 at 18), which in turn is 100%

owned by Scott Tucker (another Defendant here) (Docket No. 58 at 1-2). Partner Weekly therefore has a longstanding relationship with the Lending Defendants. Partner Weekly is affiliated with DataX, Ltd. ("DataX") (which provides consumer credit reporting and data verification services specifically for the payday lending industry) The parent company of Partner Weekly and DataX is Selling Source, LLC ("Selling Source").   Selling Source and/or Partner Weekly operate a website named www.moneymutual.com, one of the lead generators from which many of the FTC's consumer declarants were driven to the Lending Defendants' deceptive loans. **Partner Weekly, DataX, and Selling Source have been (and continue to be) important figures for Defendants' operations, and the FTC therefore issued subpoenas to all three entities.**

*FTC v. AMG Services*, ECF. No. 143 (Plaintiff's Opp. To Defs' Mot. To Quash DataX, Partner Weekly, and Selling Source Subpoenas) at 3 (emphasis added).

106.    Accordingly, Defendants were well aware of the allegations that the FTC was raising charges against Tucker, the Monitor Entities, and the tribal entities, but Defendants continued to work with and profit handsomely from its sales to Tucker's illegal payday lending business.

107.    *Third*, Defendants knew or should have known about the increasing pressure that multiple state regulators were applying not only to Tucker's payday lending business, but also to Selling Source itself, based on its questionable practices and assistance to shady lenders such as Tucker's entities.

a.    For example, since 2003, the Colorado Attorney General had been investigating Tucker's online payday lending companies, but had been stymied by the elaborate efforts to conceal Tucker's involvement in the enterprise and the invocation of "sovereign immunity."   In the Colorado litigation in 2011 and 2012, if not earlier, the state regulators were publicly claiming that the tribal involvement was a sham as Tucker owned and operated these payday lending businesses.   During this litigation, a court issued a contempt citation to Tucker for his non-appearance.

///

///

///

b.   In 2010, Pennsylvania's Department of Banking, Bureau of Compliance, Investigation, and Licensing asserted that Selling Source through its marketing and internet activities was violating consumer protection laws by engaging in unlicensed activity by assisting lenders such as the Tucker entities make illegal payday loans to Pennsylvania residents at astronomical interest rates well in excess of the State's 6% cap on interest rates. Ultimately, in 2011, Selling Source paid a penalty and entered into a consent decree, agreeing not to target Pennsylvania residents in its advertisements or otherwise make its products available to Pennsylvania residents.

c.   The State of New York conducted an investigation of Defendants and sent Selling Source a subpoena in 2013, and later entered into a consent decree with Selling Source in 2015 to resolve similar allegations for the relevant time period.

108.   *Fourth*, Defendants knew or should have known that while each of the tribes nominally held bank accounts in the names of tribal-related entities, these accounts were in reality exclusively controlled by Tucker who used the accounts to fund millions of dollars in personal expenses, including multiple international trips, a private jet, and the expenses of his professional auto racing team. As evidence of this, Alton Irby submitted a declaration in the Red River Litigation in 2009 describing Tucker as "the owner and principal manager of AMG, Selling Source's largest customer." *See* Exhibit E ¶ 8.

109.   This mountain of alarming information put Defendants on notice to inquire whether Tucker, the Monitor Entities, and/or the tribal entities were engaging in a fraudulent common enterprise and whether any funds received by Defendants at the direction of Tucker from Kansas had been made or could be made in good faith. Despite the continued presence of the mounting red flags, Defendants failed to conduct a sufficient inquiry into the bona fides of Tucker's payday lending enterprise and whether the large transfers being made to them from Kansas had a fraudulent purpose or nature.

///

110.    Nor, on information and belief, did the Defendants ever refuse to accept or return any payments based on its concerns about the bona fides of Tucker or his operations.

111.    In short, Defendants had intimate knowledge of and familiarity with Tucker's business practices and Tucker's control of and domination over the entire Overland Park operations, including the tribal entities.   Through Defendants' relationship with Tucker and Tucker-related entities, all the while receiving millions of dollars, Defendants were placed on inquiry notice of potential misconduct, fraud, or otherwise illegal conduct by Tucker and/or Tucker entities in connection with his payday lending operations.  Defendants failed to conduct a sufficient inquiry into the bona fides of Tucker's payday lending enterprise and whether the large transfers being made to them from Tucker-controlled entities had a fraudulent purpose or nature.

112.    Defendants should have evaluated whether they could in good faith continue to provide Tucker and his companies with their services, including provision of consumer leads. They also should have investigated whether any funds received by Defendants at the direction of Tucker had been made or could be made in good faith.  On information and belief, Defendants never undertook any such investigation, but instead kept receiving monies and assets that rightfully belong to the Monitorship Estate.  The precise point in time when Defendants either had such knowledge or when these growing red flags placed Defendants on such inquiry notice will be determined in discovery.

113.    Even after the public revelations and the FTC's lawsuit, Defendants remained interconnected with and steadfastly behind their largest customer and lucrative partner.

**Tucker's Transfers of Monitor Assets to Defendants**

114.    On information and belief, from his base of operations in Overland Park, Kansas, and using funds in bank accounts which he exclusively controlled and dominated, Tucker directed hundreds of millions of dollars in payments to Defendants in a variety of ways described herein.

115.    Over a period lasting nearly a decade, Defendants received hundreds of million dollars in the form of transfers of the assets rightfully belonging to Monitorship Estate.  These transfers were all made at the specific direction of Tucker.  These transfers took many forms and were from and to many different entities.  Based on currently available Monitor Entities' records,

a list of payments that were sent to Defendants is attached as Exhibit F hereto and incorporated by reference.

116.    Tucker controlled the bank accounts for all the Monitor Entities and the tribal entities.  Only Tucker (and not anyone associated with the tribes) had complete control, access to, and authority over all of the funds in these bank accounts.

117.    One thing, however, remained constant:  each transfer was made at the specific direction of Tucker, based out of the same location in Kansas as the entities he controlled, and using funds at bank accounts he too controlled.  Whether those accounts were nominally in the name of tribal entities, Monitor Entities, or other companies, Tucker had complete control over them.

118.    Defendants knew or should have known that the money received from Tucker's operations was not rightfully theirs to keep.  Rather, that money belonged to the Monitorship Estate and were the proceeds of an ongoing fraudulent enterprise being centrally operated out of Kansas and directed by Tucker.

*Transfers of Assets to Defendants prior to the London Bay Defendants' Ownership and Control*

119.    From at least 2003 until December 2007, in an amount to be determined during discovery, Tucker caused numerous payday lending entities controlled by him to make fraudulent transfers to Defendants.  At the time of the sale, these payments constituted approximately 50% of Selling Source's revenues.

120.    The precise amount of such payments will be determined during discovery.  On information and belief, these payments are in excess of $150 million.  *See id.*

121.    As the Selling Source Defendants knew or should have known, the funds Tucker directed and caused to be paid to them during this time period were assets of Monitorship Estate that were fraudulently obtained proceeds from Tucker's illegal payday lending businesses. Defendants had no good faith basis for receiving and keeping these funds belonging to the Monitorship Estate.  Moreover, on information and belief, these payments were not compensation for any legitimate services provided by Defendants and/or did not constitute reasonably equivalent value in exchange for any services rendered.

122.   On information and belief, Defendants LaFavor and McKay received certain proceeds of the fraudulent enterprise.  Given their close relationship with Tucker, and the central role that Tucker and his Overland Park enterprise had for Selling Source's business, Defendants LaFavor and McKay knew or should have known that they could not take these funds, or at least a substantial portion thereof, in good faith as they rightfully belonged to the Monitorship Estate.

*Transfers of Assets to Defendants during London Bay Defendants' Ownership and Control*

123.   After the London Bay Defendants purchased the equity stakes from Tucker and other parties in December 2007, Tucker continued to make millions of dollars in payments to Defendants through at least the end of 2012.

124.   Either from the inception of these payments, or at a point to be determined in discovery, these payments were fraudulent transfers, which rightfully belong to the Monitorship Estate.

125.   The precise amount of such payments will be determined during discovery.  On information and belief, these payments are in excess of $300 million.  *See id.*

126.   Indeed, tens of millions of dollars in transfers were even made after the FTC filed its complaint against Tucker in April of 2012 – a copy of which was served on Defendant Partner Weekly who was a defendant in the case.

*Other Transfers of Monitorship Assets to Defendants*

127.   On information and belief, there were additional transfers of the assets of the Monitorship Estate, including additional monetary transfers and gifts, made to Defendants at the direction of Tucker, which also constitute fraudulent transfers and rightfully belong to the Monitorship Estate.  The details of these transactions shall be learned through discovery in this case.  On information and belief, these payments were not compensation for any legitimate services provided by Defendants and/or did not constitute reasonably equivalent value in exchange for the services rendered by Defendants.  Defendants knew or should have known at the time of the transfers the fraudulent purpose and nature of the transfers, and Defendants certainly would have discovered the fraudulent nature and purpose of the transfers if they had conducted even the most minimal or cursory inquiry into the matter.

**COUNT I**

**FRAUDULENT TRANSFER**

**(Against All Defendants)**

128.    The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

129.    The States of Kansas has adopted a version of the Uniform Fraudulent Transfers Act ("UFTA") that is substantively identical to the UFTA.  *See* K.S.A. § 33-201 *et seq.*

130.    Under the law of Kansas, and the UFTA, fraudulent transfers include those where the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.  *See* K.S.A. § 33-204(a)(1); *see also* 11 U.S.C. § 548(a).

131.    Based on the factual allegations above, Tucker directed that assets in the form of funds that rightfully belonged to the Monitorship Estate be transferred to Defendants with the actual intent to hinder, delay, or defraud creditors of the Monitorship Estate.  These fraudulent transfers are voidable pursuant to the Kansas Uniform Fraudulent Transfer Act § 33-204(a)(1) and § 33-207(a)(1).

132.    Accordingly, the Monitor seeks to recover as fraudulent transfers of Monitorship Estate assets, including all funds and gifts received by Defendants at the direction of Tucker from Monitor Entities, tribal entities, and other entities which Tucker dominated and controlled.  The Monitor therefore requests that the Court order Defendants, jointly and severally, to pay to the Monitor all fraudulent transfers of funds they received, and to transfer to the Monitor all gifts received, as alleged herein and as further shown by proof at trial.

133.    The Monitor further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

///

///

///

///

///

# COUNT II

## QUASI-CONTRACT CLAIM FOR RESTITUTION

## BASED ON UNJUST ENRICHMENT

### (Against All Defendants)

134.    The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

135.    Here, the transfers of funds or assets of the Monitorship Estate to Defendants at the direction of Tucker to Defendants, constitute benefits conferred upon Defendants.

136.    These benefits were not conferred upon Defendants as the result of any explicit contract with Defendants.

137.    The Monitorship Estate did not receive equivalent value in return for the benefits conferred upon Defendants.

138.    Defendants have not returned these benefits to the Monitorship Estate, and have retained these benefits unjustly.

139.    Defendants' retention of the benefits of the assets of Monitorship Estate comes at the cost of the victims of Tucker's fraudulent common enterprise, whom would be entitled to the benefits as restitution.

140.    Under the circumstances alleged above, the funds and gifts constitute unjust enrichment and they must be returned to the Monitorship Estate.

141.    Because of Defendants' unjust enrichment, the Monitor seeks an equitable remedy ordering that Defendants are holding, and shall continue to hold, in constructive trust for the Monitor the entire amount of the payments and gifts made to Defendants that rightfully belong to the Monitorship Estate.

142.    The Monitor is entitled to recover prejudgment interest from Defendants from the date of the receipt of each gift or payment.

///

///

///

## COUNT III

## REQUEST FOR ACCOUNTING BY DEFENDANTS

### (Against All Defendants)

143.    The Monitor repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

144.    To ascertain the exact amounts of the assets of the Monitorship Estate received by Defendants at the direction of Tucker, including, but not limited to, all Monitor Entities, tribal entities, and related entities, and to recover the amounts subsequently transferred by Defendants to others, the Monitor seeks entry of an order compelling Defendants to file with the Court and serve upon the Monitor an accounting, under oath, detailing the amounts received from Tucker, all accounts holding Monitorship Estate assets, including, but not limited to, all Monitor Entities, tribal entities, and related entities; the current locations of the amounts, including the specific bank accounts where the distributions are held; the persons or entities with control over the accounts; and the location of any assets purchased or acquired with those moneys.

## JURY DEMAND

The Monitor demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Monitor respectfully prays for judgment against Defendants as follows:

1.    For the return of funds acquired by Defendants through fraudulent transfers and/or unjust enrichment of the Monitorship Estate's assets, including funds acquired as purported obligations supposedly owed to the Defendants by the Monitor Entities, tribal entities, and other Tucker-controlled entities;

2.    For imposition of a constructive trust in favor of Plaintiff as to all funds and gifts received by Defendants at the direction of Tucker from the Monitor Entities, tribal entities, and other Tucker-controlled entities;

3.    For a judgment ordering Defendants to file an accounting, under oath, as requested herein;

4.    For pre- and post- judgment interest;

5.    For attorneys' fees, and costs, to the extent permitted by law; and

6.    For such other and further relief as the Court may deem proper.

Dated:  November 29, 2017                           MCNAMARA SMITH LLP

                                          By:___/s/ Edward Chang_____
                                                Edward Chang
                                                Attorneys for Thomas W. McNamara,
                                                Court-Appointed Monitor

30